## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 08-42-P-H** |
| | ) | |
| | ) | |
| **FREDERICK GATES,** | ) | |
| | ) | |
| **Defendant** | ) | |

## RECOMMENDED DECISION ON MOTIONS TO SUPPRESS

Frederick Gates, charged with one count of conspiring to distribute, and to possess with intent to distribute, controlled substances, including 50 grams or more of a mixture or substance containing cocaine base and cocaine, and aiding and abetting such conduct, in violation of 21 U.S.C. §§ 846 and 841(a)(1) and 18 U.S.C. § 2 (Count One), and one count of knowingly and intentionally possessing, with intent to distribute, 50 grams or more of a mixture or substance containing cocaine base, and aiding and abetting such conduct, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count Two), *see* Superseding Indictment ("Indictment") (Docket No. 79), filed three motions to suppress evidence based on asserted unlawful police conduct in North Carolina and Maine in 2007 and 2008. *See* Defendant's Motion To Suppress ("First Motion To Suppress") (Docket No. 52); Defendant's Amended Motion To Suppress and Request for Consideration of an Additional Issue ("Second Motion To Suppress") (Docket No. 71); Defendant's Consolidated Supplemental Motion To Suppress and Response to Government's

1

Opposition to Defendant's Motion To Suppress Statemen[]ts ("Third Motion To Suppress")
(Docket No. 98).

An evidentiary hearing on all three motions was held before me on November 21, 2008,
at which the defendant appeared with counsel.  The government tendered four witnesses and
offered 10 exhibits, all of which were admitted without objection.  The defendant neither
tendered witnesses nor offered exhibits.  At the close of the evidence, counsel for both sides
argued orally.  During the course of the hearing, as discussed in greater detail below, both sides
made representations and/or concessions that narrowed the scope of the issues in dispute.  I now
recommend that the following findings of fact be adopted and that the First and Third Motions
To Suppress be denied and that the Second Motion To Dismiss be dismissed as moot.

## I.  Proposed Findings of Fact

### A.  Vehicle Stop in North Carolina on September 19, 2007

William Blair Hall, a uniformed patrol officer and a member of the Criminal Patrol Unit
of the Gaston County, North Carolina, police, was on duty in his marked police cruiser on North
Carolina's Interstate 85 at about 11 a.m. on September 19, 2007, when he observed a blue
Chevrolet Tahoe with Maine license plates exceeding the speed limit of 65 miles per hour.  As
the Tahoe sped past him, Hall noticed that the driver, a black male, was driving with his hands
locked in the "10 a.m. and 2 p.m." positions on his steering wheel in a stiff and rigid pose, facing
forward.  This struck Hall as unusual because most drivers, perhaps 90 percent, acknowledge the
presence of a marked cruiser in some manner, whether by waving, sometimes even making an
obscene gesture, slowing down, or at least glancing in the cruiser's direction.  Hall suspected that
the driver's body language was indicative of an "If I don't see him, he doesn't see me" attitude.

Hall's goal, while patrolling the interstate, is to uncover evidence of interstate criminal activity, not to ticket drivers for moving violations.  Prior to becoming a member of the Criminal Patrol Unit, he had spent five years as a Gaston County undercover narcotics officer.  He understood Interstate 85 to be the second largest pipeline for the transportation of drugs and narcotics in the eastern United States, with drugs typically flowing north and proceeds of drug trafficking usually flowing south.

After clocking the Tahoe's speed at 77 miles per hour, Hall activated his blue flashing lights and pulled it over to the shoulder of the highway.  He called the stop in to his dispatcher and activated audiovisual recording equipment with which his cruiser was equipped.  He got out and approached the passenger side of the Tahoe, which was occupied by a second black male, conducting a "plain view search" as he walked.  He noticed a Christmas tree air freshener hanging in the back window.  He also noticed that the vehicle contained no luggage and only an orange-colored piece of equipment in its back storage area and something white under the driver's seat.  He approached the passenger's side of the vehicle, noting that a second air freshener was hanging from the rear-view mirror.  He also observed a package of Swisher Sweets cigars, which in his experience commonly are used to smoke marijuana, in the center console.

The passenger rolled down his window, whereupon Hall smelled a strong odor of air freshener.  At that point, his suspicions were heightened by the lack of luggage in the car, which had Maine license plates, and the presence of two air fresheners.  In his experience, drivers typically do not hang air fresheners in the rear of their vehicles, and such fresheners are used to mask the odor of contraband.  However, he admits, fresheners can be used for other purposes, such as masking pet odors, and the defendant and White were traveling with a puppy.

3

Hall asked the driver, the defendant, for his driver's license. As is Hall's custom, he refrained from asking for the vehicle's registration at that time to preserve the option of re-approaching the occupants later in order to ask for that document. Hall noticed that the defendant was nervous and couldn't sit still. Hall asked him where he was going. The defendant paused for a moment before answering, "Georgia." When Hall asked how long the defendant planned to be there, the defendant replied, "Uh, a couple of days." This, too, raised Hall's suspicions because most people answer questions about where they are going and how long they will be there without hesitation.

Hall returned to his cruiser with the defendant's license and ran a search on his onboard computer of the license and the vehicle's plates. At this point, although Hall had not seen or smelled the odor of drugs or observed large sums of cash, he had made up his mind that further investigation was warranted. He suspected that the defendant and his passenger were involved in money laundering, bringing drug trafficking proceeds to Atlanta. He called for backup from two fellow officers and attempted unsuccessfully to contact his department's canine unit via computer. Hall confirmed via computer search that the defendant had a valid driver's license. He could find no computerized record of the vehicle's registration.

About two minutes into the traffic stop, the two backup police officers whom Hall had called, including Brent Roberts, arrived on the scene. Hall briefed Roberts on his observations and suspicions and asked him to identify the passenger. Hall also radioed the canine unit, which he succeeded in reaching this time, and learned that the unit was about 12 minutes away.

Roberts approached the passenger, who identified himself as MacKenzie White and said that he had no license. Roberts noticed a white object behind the driver's seat that appeared to him to be either digital scales or a food processor. He also observed the box of Swisher Sweets

4

cigars in the center console and some residue that he was fairly certain, given its green hue, derived from marijuana.  Roberts asked for the vehicle's registration.  While White was searching for it in the glove compartment, a driver's license fell out.  Roberts asked to see it and concluded that it was not that of the defendant or White.  White produced a registration and recent bill of sale, which Roberts gave to Hall, together with the third party's driver's license. The recent sale explained why Hall had been unable to find evidence of the car's registration in his computerized database.  Hall also ran a criminal history search on the defendant, learning that he previously had been charged with several crimes, including possession of a firearm by a felon.

At approximately 11:21 a.m., Hall exited his cruiser, approached the defendant, and asked him to get out of the vehicle.  He walked with the defendant to the back of the Tahoe. Hall, who was carrying papers in his hand, pointed to one of the documents, the license that had fallen out of the glove compartment, and inquired, "Who's this fellow right here?"  The defendant said that the license belonged to a friend in Georgia who had considered moving to Maine but had decided against it and had gone home to Georgia.  Hall disbelieved the explanation, doubting that anyone would carelessly leave a driver's license in another's vehicle. Hall also inquired who the passenger was and how the defendant knew him.  The defendant explained that he was MacKenzie White, a distant cousin.

Hall then informed the defendant that he had decided merely to give him a warning rather than a citation for speeding.  As is typically the case when Hall delivers this news, the defendant appeared relieved.  The giving of a warning rather than a ticket was a standard tactic for Hall in cases in which he intended to ask for consent to a fuller search, because he believed that it predisposed the driver to respond more favorably to the consent request.  Hall also typically asked the driver in such cases to exit the vehicle so that he could get a better read of the driver's

whole body language.  During the time that Hall was conversing with the defendant outside of the Tahoe, the canine unit arrived on the scene.

Hall told the defendant that the warning he was issuing was "a record of when and where and why I stopped you; there's nothing to it, um you can throw it away when you get to your destination."  Gov't Exh. 1B-T at 3.[1]  Hall then gave the defendant the documents he was carrying, and the defendant thanked Hall.[2]  Hall then immediately added, "Let me ask you something."  *Id*.  After briefly quizzing the defendant about the duration of his planned stay in Georgia, Hall stated, "Let me, I'm gonna, I'm gonna, I'd like to run my canine around your car."  *Id*.  The defendant said, "Okay."  *Id*.  Hall then asked whether there was anything illegal in the car, which the defendant denied.  Hall inquired whether the defendant had anything on him, and then conducted a pat-down search of the defendant's person.  He felt what he believed to be a wad of currency in the defendant's left front pocket and asked him to remove it.  The defendant did so, producing a large sum of currency folded and secured with black rubber bands.  This, in Hall's experience, was consistent with the manner in which drug traffickers package currency.  The defendant also had several cell phones.  In Hall's experience, those engaged in criminal activity typically carry more than one cell phone.  Hall directed the passenger, White, to exit the vehicle and patted him down, as well.

After Hall began questioning the defendant anew following issuance of the warning, the defendant again began to display signs of what Hall took to be stress or nervousness, talking with his hands, scratching his face, and moving around as the men conversed.  Had the defendant not

---

[1] As an aid to the court, the government prepared transcripts of select parts of the audio portion of Hall's audiovisual recording of the encounter.  I reviewed the recording and am satisfied that the portions of the transcript quoted herein accurately reflect the underlying dialogue.

[2] From all that appears, when Hall issued the defendant a warning, he returned the documents that he and Roberts had obtained during the traffic stop.  On the videotape of the encounter, Hall can be seen and heard asking about the third party's license and pointing to the papers in his hand while conversing with the defendant at the back of the Tahoe.  The defendant then can be seen taking the papers from Hall.

consented to the canine search, Hall intended to tell him that he suspected that the defendant was carrying contraband and that he was going to detain the vehicle to run the dog around it, although the defendant himself was not detained.

After the defendant and White left the vehicle, the canine handler ran his dog around the exterior.   The dog "alerted" to the front passenger side, jumping up and pawing at the door, signifying the presence of contraband.   Hall and Roberts asked the defendant and White what might be causing the dog to alert.   White admitted to having smoked marijuana during the trip and produced a small bag of marijuana to Roberts.   Hall then instructed the dog's handler to put the dog inside the vehicle and continue the search there.   No contraband was found that was linked to the defendant.   However, after Hall consulted with the United States Bureau of Immigration and Customs Enforcement ("ICE"), the defendant and White were detained on ICE's authority.

## B.  November 13, 2007, Search of Defendant's Person, Residence

On August 29, 2007, the defendant was arrested in Lewiston, Maine, on a state charge of operating under the influence.  *See* Gov't Exh. 3.  He was released on bail pending a scheduled court appearance on that charge on November 14, 2007, with conditions that included his agreement not to use or possess any alcoholic beverages or illegal drugs.  *See id*.  He further agreed, as a condition of bail, that:

> In order to determine if I have violated any prohibitions of this bond regarding alcoholic beverages, illegal drugs or dangerous weapons, I will submit to searches of my person, vehicle and residence and, if applicable, to chemical tests . . . upon articulable suspicion.

*Id*.

On October 10, 2007, the defendant was arrested in Lewiston on state charges of disorderly conduct and refusing to submit to arrest.  *See* Gov't Exh. 2.  He was released on bail pending a scheduled court appearance on those charges on December 12, 2007, with conditions

that included his agreement not to use or possess any alcoholic beverages or illegal drugs.  *See*

*id*.  He further agreed, as a condition of bail, that:

> In order to determine if I have violated any prohibitions of this bond regarding alcoholic beverages, illegal drugs or dangerous weapons, I will submit to searches of my person, vehicle and residence and, if applicable, to chemical tests . . . at any time without articulable suspicion or probable cause.

*Id*.

On November 13, 2007, Lewiston police officer Michael Dumond and Maine Drug Enforcement Agency task force agent Wayne Clifford observed the defendant leave Dave's Store, a convenience store located at the corner of Sabattus and College streets in Lewiston, carrying a brown bag that appeared to contain a six-pack or a twelve-pack of a beverage. Dumond knew that the defendant resided in an apartment at 28 Howe Street, not far from Dave's Store. Dumond also was aware that the defendant was subject to bail conditions, including random search of both his person and his residence.  Because neither Dumond nor Clifford was in uniform, Dumond contacted a uniformed police officer, Brian Rose, and asked him to conduct a field interview of the defendant.

Rose stopped the defendant as he was heading in the direction of, and was only about 100 feet away from, his apartment at 28 Howe Street.  About two minutes after that stop, as Rose was confirming the defendant's bail conditions with him, Dumond joined them.  The defendant was found to have been carrying beer, a violation of his bail conditions.  The defendant was placed in Rose's cruiser, and Rose told him he was going to search his residence, per his bail conditions. The defendant said words to the effect, "Yeah, whatever."  Either Rose or a fourth officer, Eric Syphers, removed a key from the defendant's pocket without asking his permission to do so, and used that key to gain access to his apartment, which officers then searched.

### C.  January 26, 2008, Search of Defendant's Cell Phones

At approximately 2:30 a.m. on January 26, 2008, acting on a tip relayed by Dumond that drug-trafficking activity was afoot, Lewiston police officer Gregory D. Boucher and a colleague set up surveillance of an apartment at 106 Walnut Street in Lewiston.

Shortly after 3 a.m., Boucher observed a maroon vehicle park on the street in front of 106 Walnut Street.  A female exited the vehicle, popped the trunk, got back inside the vehicle and honked the horn.  A minute or two later, two black males emerged from the apartment and got into the vehicle.  As the vehicle drove past his cruiser, Boucher, who knew the defendant by sight, observed that the female was driving, the defendant was in the front passenger seat, and the third male, whom he recognized as Brandon Johnson, was in the back seat.

Boucher and his colleague, who were in uniform and driving a marked cruiser, followed the maroon vehicle.  They observed the driver speed and then roll through a stop sign.  Shortly thereafter, Boucher pulled the maroon vehicle over.  He confirmed that the defendant and Johnson were passengers and identified the driver as Robin Thiel.  He ran a computerized check that showed that both the defendant and Johnson were released on bail conditions that included random searches and tests.  He asked the defendant and Johnson to step out of the car.  Boucher's colleague performed pat-down searches of both the defendant and Johnson, finding a small bag of marijuana on Johnson's person.  Boucher asked Thiel to step out of the vehicle and asked her where she was going.  She said she was taking the defendant and Johnson to Auburn and, when the defendant noticed the car was being followed by police, he stuck a baggie that she believed contained crack cocaine into her waistband.  She retrieved a baggie from her waistband and turned it over to Boucher.

Boucher decided to arrest both the defendant and Johnson. About five minutes had passed since initiation of the vehicle stop. Boucher's colleague handcuffed both men. After the defendant was handcuffed, Boucher seized his cell phones and searched them for incoming and outgoing phone calls and text messages, noting on a piece of paper what he found. He conducted this search at the arrest site. Shortly thereafter, within 30 minutes of the initial stop of the vehicle, the defendant and Johnson were transported to the police station.

The defendant's cell phones posed no threat or safety issue. While there is always a risk that information stored electronically can be lost, the defendant's cell phones appeared to be functioning normally.

## II. Discussion

In his First Motion To Suppress, the defendant challenges the November 13, 2007, search of his person and residence and the January 26, 2008, vehicle stop and search of his cell phones. *See* First Motion To Suppress at 3-6.

With respect to the November 13, 2007, search, the defendant argues in his papers that (i) his bail conditions were unreasonable and violated the Fourth Amendment because they were not the least restrictive conditions needed to ensure his presence in court for a pending criminal matter, (ii) even if those conditions were reasonable, he withdrew his consent to them by declining the search, (iii) his consent, if any, expired upon his arrest for violating his bail, (iv) nothing in his bail conditions permitted officers to take his key from his pocket without his consent and use it to gain access to his apartment, and (v) any statements obtained following his arrest not only were obtained as a result of the foregoing violations but also "were unconstitutionally obtained in the absence of his Fifth Amendment right to remain silent." *Id*. at 4-5.

At hearing, defense counsel narrowed and refined these arguments, asserting that his client's bail conditions did not permit the taking of a key from his pocket or the random search of his residence following his arrest for violating those conditions. He clarified that he did not contest the reasonableness of the underlying bail conditions except to the extent that they permitted a search in those circumstances.

With respect to the January 26, 2008, traffic stop, the defendant asserts in his papers that (i) officers lacked a reasonable and articulable suspicion to stop the vehicle, (ii) even if the initial stop was legitimate, their subsequent actions exceeded any reasonable scope, and (iii) the defendant's cell phones were searched without a warrant and in the absence of satisfaction of any exception to the warrant requirement. *See id*. at 5-6.

At hearing, defense counsel conceded the validity of the January 26, 2008, traffic stop, clarifying that, with respect to that incident, he continues to press only the point that his client's cell phones were unlawfully searched.

In his Second Motion To Suppress, the defendant sought to suppress statements obtained in January 2008 in asserted violation of his Sixth Amendment right to counsel. *See generally* Second Motion To Suppress. At hearing, counsel for the government represented that the government will not seek to introduce any of those statements in its case in chief. On the strength of that representation, which of course the government is expected to honor, defense counsel acknowledged that the Second Motion To Suppress is moot.

The defendant continues to press the central points made in his Third Motion To Suppress: that, while North Carolina officers had a legitimate basis for the initial stop of the Tahoe on September 19, 2007, their actions quickly exceeded reasonable bounds, transforming

the stop into an illegal detention and vitiating any purported consent given to the canine search. *See* Third Motion To Suppress at 5-8.

In the face of these challenges, the government bears the burden of proving both the legitimacy of the September 19, 2007, North Carolina traffic stop and the January 26, 2008, cell phone search. *See, e.g., United States v. Ramos-Morales*, 981 F.2d 625, 628 (1st Cir. 1992) (government bears burden of proving the lawfulness of warrantless searches and seizures). In the context of a search and seizure undertaken pursuant to bail conditions, the government meets its burden of showing consent to such a search by pointing to bail conditions permitting it. *See, e.g., State v. Ullring*, 1999 ME 183, ¶ 26, 741 A.2d 1065, 1073. The burden then shifts to the defendant to present evidence showing that the bail conditions were unreasonable in the circumstances. *See id*. I consider the defendant's points in chronological order, finding, for the reasons that follow, that the government meets its respective burdens, and that the defendant falls short of establishing the unreasonableness of his bail conditions.

### A.  September 19, 2007, Traffic Stop

The defendant correctly points out that, with respect to the legality of the North Carolina traffic stop, the law of the United States Court of Appeals for the Fourth Circuit controls. *See* Third Motion To Suppress at 4-5; *see also, e.g., United States v. Ozuna*, 129 F. Supp.2d 1345, 1354 (S.D. Fla. 2001), *aff'd*, 48 Fed. Appx. 739 (11th Cir. 2002) ("The few federal cases that have addressed a similar choice-of-law issue in the criminal context have adopted a lex loci (i.e., the 'law of the place' of the conduct) approach."); *United States v. Restrepo*, 890 F. Supp. 180, 191 (E.D.N.Y. 1995) ("The Memphis officers should have been able to rely on their understanding of the law in the Sixth Circuit and could not have been expected to know the law in circuits other than the one in which they were operating.").

The Fourth Circuit has stated:

> If a police officer observes a traffic violation, he is justified in stopping the vehicle for long enough to issue the driver a citation and determine that the driver is entitled to operate his vehicle.  The driver's consent or reasonable suspicion of a crime is necessary to extend a traffic stop for investigatory purposes.

*United States v. Branch*, 537 F.3d 328, 337 (4th Cir. 2008).  "The maximum acceptable length of a routine traffic stop cannot be stated with mathematical precision."  *Id*. at 336.  "Instead, the appropriate constitutional inquiry is whether the detention lasted longer than was necessary, given its purpose."  *Id.  See also, e.g., United States v. Rusher*, 966 F.2d 868, 876 (4th Cir. 1992) ("The officer [] may request a driver's license and vehicle registration, run a computer check, and issue a citation.  When the driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning.") (citation and internal quotation marks omitted).

To the extent that a traffic stop is prolonged beyond this point for investigative purposes, in the absence of the driver's consent, its reasonableness is judged with reference to the standards of *Terry v. Ohio*, 392 U.S. 1 (1968).  *See Branch*, 537 F.3d at 336-37.  The Fourth Circuit has highlighted four points central to the *Terry* stop analysis:

1.      "*Terry's* 'reasonable suspicion' standard is less demanding than probable cause."  *Id*. at 336 (citation and internal punctuation omitted).  "Indeed, in order to justify a *Terry* stop, a police officer must simply point to specific and articulable facts which, taken together with rational inferences from those facts, evince more than an inchoate and unparticularized suspicion or hunch of criminal activity."  *Id*. (citations and internal quotation marks omitted).

2.      "[A] court must take a commonsense and contextual approach to evaluating the legality of a *Terry* stop. . . . '[R]easonable suspicion' is a nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men,

13

not legal technicians, act." *Id*. (citations and internal punctuation omitted). Thus, context and "respect for the training and expertise of police officers" matter. *Id*.

3. "Courts must look at the cumulative information available to the officer, and not find a stop unjustified based merely on a piecemeal refutation of each individual fact and inference." *Id*. at 337 (citations and internal quotation marks omitted). "It is the entire mosaic that counts, not single tiles." *Id*. (citation and internal quotation marks omitted). *See also, e.g., United States v. Blanc*, 245 Fed. Appx. 271, 273 (4th Cir. 2007) ("[A] person's behavior, though appearing innocent, may raise questions justifying a detention when viewed in the totality and combined with the police officer's knowledge and experience.").

4. "[A] police officer's decision to stop and detain an individual must be evaluated objectively. Thus, the lawfulness of a *Terry* stop turns not on the officer's actual state of mind at the time the challenged action was taken, but rather on an objective assessment of the officer's actions." *Branch*, 537 F.3d at 337 (citations and internal quotation marks omitted).

The Fourth Circuit has made clear, however, that "if the traffic stop becomes a consensual encounter, the *Terry* inquiry would not be employed, and the stop would instead be governed by the Supreme Court's analysis in *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), because a consensual encounter does not trigger Fourth Amendment scrutiny." *United States v. Meikle*, 407 F.3d 670, 672 (4th Cir. 2005) (citation and internal quotation marks omitted). The Fourth Circuit has observed:

> Under *Bostick*, the question is whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter. This inquiry involves an objective analysis of the totality of [the] circumstances. If a reasonable person would have felt free to decline the officer's request or otherwise terminate the encounter, and the suspect freely gives consent to search at this point, there is no need to reach the issue of whether the initial stop was permissible under *Terry*.

*Id*. at 672 (citations and internal quotation marks omitted).

In *Meikle*, the Fourth Circuit found that a routine traffic stop became a consensual encounter when (i) a total of 11 minutes passed between the time of the initial stop and the time that the officer issued a warning citation, returned the driver's license and registration, and shook his hand, (ii) several seconds later, as the driver turned and was beginning to walk away, the officer asked if he could speak with him, and (iii) the driver engaged in a further conversation with the officer during which he consented to a search of his vehicle. *See id*. at 673. The Fourth Circuit reasoned that, even though the officer had not expressly told Meikle that he was free to go, as had occurred in the remarkably similar *Rusher* case, Meikle nonetheless understood that he was free to leave, having shaken hands with the officer and begun to depart, and the officer had returned all of Meikle's papers, which also signified that he was free to leave. *See id*. at 673-74.

At hearing, defense counsel argued that it is clear that Hall's intent was to undertake some sort of criminal investigation, that Hall had nothing more than a hunch of criminal activity, that the roadside detention for a period of 20 to 25 minutes prior to issuance of the warning citation was grossly excessive, with Hall clearly delaying until the canine unit's arrival, and that any purported consent to the dog search was not given freely and voluntarily but, rather, was a fruit of the initial illegal detention and of the overall coercive atmosphere, with four officers by then present at the scene. Counsel for the government posited that the instant case is parallel to, and controlled by, *Meikle.* Alternatively, he argued, Hall had developed reasonable suspicion to effectuate an investigative *Terry* stop.

On cross-examination, Hall denied that he deliberately extended the traffic-violation portion of the Tahoe stop to await the arrival of a canine unit. A viewing of Hall's tape of the

encounter bears this out.  Hall first approached the Tahoe at approximately 11:02 a.m.  *See* Gov't

Exh. 1 at 11:01:45.  He delivered a warning citation to the defendant approximately 20 minutes

later, at 11:22 a.m.  *See id*. at 11:21:56.  In the interim, he promptly sought a check on the

defendant's license, ran an unsuccessful search of the Tahoe's license plate number, and

requested a criminal history check on the defendant.  At approximately 11:11 a.m., he asked

Roberts to obtain the vehicle's registration and to check the passenger's license.  *See id*. at

11:10:50.  Roberts returned to Hall's cruiser about a minute later with bill-of-sale papers for the

Tahoe and the license of a third person, not present in the vehicle.  *See id*. at 11:11:59.  The

recent bill-of-sale papers explained why the vehicle's registration had not appeared in the

database Hall had been searching.  However, Hall still was awaiting the results of other reports

that he had sought.  From approximately 11:16 a.m. to 11:20 a.m., he spoke with an unidentified

caller who affirmed that the defendant's driver's license was valid, noted that the defendant had

no outstanding warrants for his arrest, and reported that the defendant did have a criminal

history, which the caller described to Hall in detail.  *See id*. at 11:15:32 to 11:19:41.  Shortly

after Hall ended that phone call, he exited his cruiser and re-approached the defendant.  When he

did so, he returned the defendant's papers, issued him a warning, and assured him that he was

free to tear the warning up when he arrived at his destination.  The defendant understandably

appeared relieved, and thanked Hall.

     While Hall subjectively intended to conduct an investigatory detention, that intention is

not relevant to whether, as an objective matter, the defendant was detained for a reasonable

period of time incident to the initial traffic stop.  I conclude that he was.  The stop is otherwise

indistinguishable in all material respects from those at issue in *Miekle* and *Rusher*, in which the

driver was asked, following the end of the traffic stop as signaled by the return of documents and

issuance of a warning, whether he would consent to a further search.  *See Miekle*, 407 F.3d at 673-74; *Rusher*, 966 F.2d at 876-77.

There are no indicia that the defendant's consent to the search was not voluntary.  While four officers were present at the scene, there is no evidence that any of them drew his weapon, threatened, or even raised his voice to the defendant.  Hall alone spoke with the defendant to obtain his consent to the canine search.  In so doing, Hall employed a pleasant, normal tone of voice, even at one point bantering with the defendant in response to the defendant's comment that he got a lot of tickets.  When Hall stated that he wanted to run a dog around the exterior of the car, the defendant readily replied, "Okay."  The defendant, who had a criminal history, was no neophyte to the criminal justice system.

In similar circumstances, the Fourth Circuit has discerned voluntary consent to a search following a roadside traffic stop.  *See, e.g., United States v. Farrior*, 535 F.3d 210, 219 (4th Cir. 2008) ("The fact that Officer Morris had returned Farrior's license and registration also strongly indicates that the encounter was consensual and that no seizure occurred within the meaning of the Fourth Amendment.  Indeed, on numerous occasions we have found similar exchanges between an officer and an individual after the officer has returned the individual's license and registration to be consensual and thus not violative of the Fourth Amendment.") (citations omitted); *United States v. Jackson*, 235 Fed. Appx. 155, 156 (4th Cir. 2007) ("As the district court noted, nothing in the record indicates that Jackson's consent was involuntary as Jackson had been arrested more than once and had experience with the criminal justice system, asked about probable cause, and told Trooper Bird that he was a businessman.  The circumstances were not coercive, deceptive, or intimidating.  The encounter remained consensual because Jackson voluntarily cooperated with Trooper Bird.").

In any event, even assuming *arguendo* that North Carolina officers' actions should be viewed through the lens of *Terry* rather than *Bostick*, either because the initial 20-minute detention was excessive or because a reasonable person in the defendant's shoes would not have felt free to decline the officer's requests or otherwise terminate the encounter, officers had developed sufficient reasonable articulable suspicion to prolong the encounter beyond the period of time necessary to process the speeding violation.

While it is true, as defense counsel emphasized at the hearing, that officers had no visible evidence that the defendant was engaged in criminal activity, they had more than a hunch.  As Hall testified at the hearing, his suspicions mounted as he viewed an air freshener hanging in the back of the car, a usage consistent with drug traffickers' efforts to mask odors of contraband, viewed Swisher Sweets in the center console, which he knew are often used to smoke marijuana, noticed no luggage in the car despite the alleged trip from Maine to visit family in Georgia, observed nervousness and hesitation on the part of the defendant in answering simple questions regarding his destination and length of stay, was informed by Roberts that a third party's driver's license had been found in the car's glove compartment, and learned that the defendant had a criminal history, including a charge for possession of a firearm by a felon.

In addition, Hall knew that Interstate 85 was the second largest drug trafficking corridor in the eastern United States, with drugs typically flowing north and drug proceeds typically flowing south.  Putting all of these pieces of the mosaic together, Hall harbored a reasonable, articulable suspicion that the defendant and his passenger were not merely making an innocent trip to visit family in Georgia, but might be transporting cash representing proceeds of drug trafficking.  *See Blanc*, 245 Fed. Appx. at 273 (officer who made roadside traffic stop on Interstate 85 in South Carolina had reasonable, articulable suspicion that criminal activity was

afoot when driver provided vague and deceptive information about his visit, appeared evasive about his employment, was driving a rental car rented in Texas that was overdue by three weeks, and drug traffickers frequently drove rental cars, the cities with which the driver was linked, Miami, Atlanta, Charlotte, and Houston, were known by officer to be source cities for drug trafficking, Interstate 85 was known to officer as a major drug trafficking highway, and officer's partner thought he smelled marijuana in vehicle).

In this scenario, the defendant was properly detained pursuant to *Terry* when Hall asked for his consent to run the canine around the vehicle. For the reasons discussed above, that consent was voluntarily given.

### B. November 13, 2007, Search of Residence

The defendant next contends that the search of his residence on November 13, 2007, was unlawful because (i) nothing in his bail conditions permitted the taking of a key from his person to effectuate that search, and (ii) his arrest for violation of his bail conditions terminated any authority conferred by the bail bonds to conduct searches for purposes of determining whether he was in violation of his bail conditions. At hearing, his counsel posited that if his client's bail conditions permit this search, they presumably would permit police arresting an individual stopped in Cumberland, who had a house in Hollis and a ski home at Sugarloaf, to search both the Hollis and Sugarloaf homes following a Cumberland stop and arrest. Such searches, he posited, exceed the bounds of legitimate checks on compliance with bail conditions, instead becoming warrantless investigatory searches.

Counsel for the government countered that, whatever the outer bounds of permissible bail searches, in this case the search of the defendant's residence was undertaken contemporaneously with his arrest and in close proximity to the site where he was arrested, as a result of which it

was part and parcel of officers' check on the defendant's compliance with bail conditions.  He observed that he was unaware of any authority that an arrest for bail non-compliance terminates or otherwise modifies bail conditions, which he reasoned can be modified only by the issuing authority.  Finally, he asserted that officers permissibly removed the defendant's key to facilitate the entry into his residence permitted by the bail conditions.

The government's arguments are persuasive.  The defendant agreed, as part of bail conditions imposed on October 10, 2007, to submit to searches of his person, vehicle, and residence, at any time and without articulable suspicion or probable cause, for purposes of determining if he had violated any prohibitions of his bail bond regarding alcoholic beverages, illegal drugs, or dangerous weapons.  *See* Gov't Exh. 2.  The defendant was stopped when approximately 100 feet from his residence, evidently in the process of returning home after making a purchase at a nearby convenience store.  He was found to be in violation of his bail bond by virtue of his possession of beer.  The fact of his arrest for violation of bail conditions did not, in itself, work a modification of those bail conditions or otherwise disable officers from further inquiry into his bail condition compliance.  *See* 15 M.R.S.A. § 1026(3)(C) (contemplating modification of bail conditions by court).

A reasonable police officer could have concluded that possession of beer might not have been the defendant's only bail violation and that a search of his nearby residence might turn up additional such violations.  The defendant had agreed to submit to such a search as part of his bail bond and, insofar as appears, he did just that.  When told that officers intended to search his residence, he said words to the effect, "Yeah, whatever."  There is no evidence that he revoked that consent prior to the search of his residence that he now contests.  Nor, from all that appears, did he protest removal of the key from his pocket or its use to gain entry into his apartment for

purposes of the search.  In the circumstances, as counsel for the government argued, the extraction of the key from the defendant's pocket simply facilitated a permitted search.  The search accordingly was performed in accordance with the defendant's bail conditions.

To the extent that the defendant argues that the bail conditions, if they permitted the challenged search, were unreasonable in the circumstances, he places no evidence on his side of the scales.  Any Fourth Amendment challenge to the reasonableness of the bail conditions accordingly fails.  *See Ullring*, 1999 ME 183, ¶¶ 26-27, 741 A.2d at 1073.[3]

### C.  January 26, 2008, Cell Phone Search

The defendant finally challenges Boucher's January 26, 2008, search of his cell phones, which he contends was impermissible in the absence of a search warrant.  *See* First Motion To Suppress at 6.  This court has held a warrantless search of a defendant's cell phone contents lawful when "substantially contemporaneous" with the defendant's arrest.  *See United States v. Curry*, Criminal No. 07-100-P-H, 2008 WL 219966, at *10 (D. Me. Jan. 23, 2008) (rec. dec., *aff'd* Feb. 12, 2008).  Boucher's search of the defendant's cell phones, which occurred within minutes of the defendant's arrest at the scene of the traffic stop where the arrest occurred, clearly passes muster.  *Compare id.* (search of cell phone contents lawful when phones were seized in field at time of arrest, search occurred within half hour of arrest, and search took place at locale close to scene of arrest).

### III.  Conclusion

For the foregoing reasons, I recommend that that the First and Third Motions To Suppress be denied and that the Second Motion To Dismiss be dismissed as moot.

---

[3] I need not and do not address whether, as counsel for the government posited at hearing, the defendant's bail conditions would have permitted officers to use force to enter his apartment in his absence.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof.   A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 19th day of December, 2008.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge